## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

| | |
|---|---|
| LAWRENCE ETHRIDGE, JON McINTYRE, and ROBERT ROYCE, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF GRANTVILLE, GEORGIA; CASEY EVANS; AL GRIESHABER, JR.; CLIFF SCHRIEFER; JIM SELLS;  ALAN WACASER; and GEORGE ("STEVE") WHITLOCK, <br><br> Defendants. | Civil Action No. _____ <br><br><br><br> **JURY TRIAL DEMANDED** |

# COMPLAINT

## INTRODUCTION AND SUMMARY

1.

The Defendants in this case are the City of Grantville, Georgia, and some of its leading officials. They have engaged in a widespread campaign to retaliate against and persecute citizens who criticize them or attempt to investigate questionable practices and outright abuses.

2.

The abuses include, among many other things, targeted and pervasive racial discrimination in the Grantville Police Department, whose chief likes to tell its members that its "okay to call someone a [N-word] if they're acting like a [N-word]." The same chief has put a convicted felon in a police uniform and police car and allowed him—weapon and all—to impersonate a police officer. And the chief has issued police officers AR-15 semi-automatic rifles without providing or requiring appropriate training and certification on such weapons.

3.

Plaintiff Lawrence Lawrence Ethridge was a Grantville police officer who suffered the direct effects of illegal racial discrimination for years.

4.

Mr. Ethridge and the other two Plaintiffs in this case, Jon McIntyre and Robert Royce, have endured retaliation by the Defendants including withholding of pay, slanderous interference with their employment and business relationships, a crusade of vicious harassment and intimidation by the police (such as threateningly tailing their vehicles and surveilling their homes) and, in Mr. Royce's case, even attempting to institute bogus criminal charges.

5.

The Defendants' malevolent crusade is ongoing to this day, necessitating this lawsuit to end it and to obtain justice.

## THE PARTIES

6.

Plaintiff Lawrence Ethridge (**"Mr. Ethridge"**) resides in LaGrange, Georgia, which is within this federal judicial district.

7.

Plaintiff Jon McIntyre (**"Mr. McIntyre"**) resides in Grantville, Coweta County, Georgia, which is within this federal judicial district.

8.

Plaintiff Robert Royce (**"Mr. Royce"**) resides in Grantville, Coweta County, Georgia, which is within this federal judicial district.

9.

Defendant the City of Grantville Georgia (**"Grantville"** or the **"City"**) is a municipality within Coweta County, Georgia, which is within this federal judicial district and division.

10.

Defendant Casey Evans (**"Councilwoman Evans"**) is a member of Grantville's City Council. She resides within this State and federal judicial district.

11.

Defendant Al Grieshaber Jr. (**"City Manager Grieshaber"**) is Grantville's city manager. He may be served with process at his public office, 123 LaGrange Street, Grantville, Georgia 30220, during business hours.

12.

Defendant Cliff Schriefer (**"Chief Schriefer"**) is assistant chief of Grantville's police department. He  resides within this State and federal judicial district and may be served with process during business hours at 123 LaGrange Street, Grantville, Georgia, 30220.

13.

Defendant Jim Sells (**"Councilman Sells"**) is a member of Grantville's City Council. He resides within this State and federal judicial district.

14.

Defendant George ("Steve") Whitlock (**"Chief Whitlock"**) is the chief of Grantville's Police Department. He resides within this State and federal judicial

district and may be served with process during business hours at 123 LaGrange

Street, Grantville, Georgia 30220.

## VENUE AND JURISDICTION

15.

This Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332 because the Plaintiffs' claims arise under the laws of the United

States.

16.

Venue is proper in this district because, among other things, this is the

judicial district in which a substantial part of the events giving rise to the Plaintiff's

claims arose.

17.

Defendants are all subject to personal jurisdiction in this Court because most

of them reside and are domiciled in this State and all of them regularly transact

business in this State and have committed in this State the acts and omissions upon

which the Plaintiffs' claims are based.

## THE PLAINTIFFS' EXERCISE OF THEIR
## RIGHT TO FREE SPEECH

18.

In 2021, Mr. Royce set up a public website, www.grantvillecorruption.com

(the **"Grantville Corruption Website"**) where he has expressed criticism of City

officials, including the Defendants.

19.

Mr. Royce has obtained information for his Grantville Corruption Website

by sending requests for information under the Georgia Open Records Act,

O.C.G.A. § 50-18-70 *et seq*. (the **"Open Records Act"** or **"ORA"**)

20.

Defendants have expressed displeasure at being criticized on the Grantville

Corruption Website.

21.

Defendants have also expressed displeasure at Mr. Royce's Open Records

Act requests.

22.

Defendant Sells has made public statements alleging that Mr. Royce is acting in concert with Grantville's mayor in a scheme to create mistrust and force city employees to resign.

23.

Defendant Sells has made a public statement calling Mr. Royce the mayor's "pitbull buddy."

24.

Grantville's mayor has nothing to do with Mr. Royce's pursuit of disclosures under the Open Records Act, and the mayor also has nothing to do with Mr. Royce's work on the Grantville Corruption Website.

25.

Defendant Sells has publicly stated that Mr. Royce is a "hired gun" and that "[h]e's paid to create mistrust and get people to resign."

26.

Mr. Royce is not being paid by anyone for his Open Record Act requests, nor is anyone paying him for his work on the Grantville Corruption Website.

27.

In the fall of 2021, Chief Whitlock instructed a purported volunteer police chaplain to impersonate a police officer. At Chief Whitlock's direction, the purported volunteer police chaplain donned a police uniform and used a marked police vehicle. The volunteer police chaplain was also carrying a firearm while wearing the police uniform and using the police vehicle.

28.

In addition to not being a certified peace officer, the volunteer police chaplain whom Chief Whitlock instructed to impersonate a police officer is also a convicted felon.

29.

Exercising his right to free speech under the First Amendment to the United States Constitution, Mr. Royce publicly criticized Chief Whitlock's decision to allow the volunteer police chaplain to impersonate a police officer. He posted about the matter and also submitted reports to, among others, the Georgia Peace Officer Standards and Training Council **("POST")** and the City Council.

30.

Mr. McIntyre also exercised his free-speech right by criticizing Chief

Whitlock's decision to allow the volunteer police chaplain to impersonate a police

officer. He raised the matter with, among others, people in the Coweta County

District Attorneys' Office and the Coweta County Courthouse.

31.

In addition, Mr. McIntyre challenged Chief Whitlock directly and in-person

for Chief Whitlock's decision to allow the volunteer police chaplain to impersonate

a police officer.

32.

Around the same time, Mr. McIntyre also spoke out concerning other police

matters, such as Chief Whitlock's decision to have Grantville's police officers

carry AR15 semi-automatic rifles without being properly trained or certified to use

such a weapon.

## DEFENDANTS' RETALIATION AGAINST MR. ROYCE

33.

At a meeting of the Grantville City Council in March 2022, Councilman Wacaser moved for a vote to direct the City Attorney to consult with the Coweta County District Attorney and "seek an indictment against Mr. Royce" under the so-called "HB 838," *i.e.*, O.C.G.A. § 35-8-7.3 *et seq*.

34.

Councilman Wacaser's motion called, specifically to "direct our City Attorney … to confer with the District Attorney to follow up based on House Bill 838 and press charges against Robert Royce."

35.

In discussing and pressing his motion, Councilman Wacaser urged the City Attorney to "give it all" in pursuing charges against Mr. Royce.

36.

Councilman Wacaser emphasized his specific desire that it be criminal charges—not just a civil claim—against Mr. Royce.

37.

Mr. Royce has never caused death or serious bodily harm to any member of the Grantville police department or any other first responder in Grantville.

38.

Mr. Royce has never caused damage to or destroyed any real or personal property of any person in Grantville because of that person's actual or perceived employment as a first responder.

39.

In discussing the motion to pursue a criminal indictment of Mr. Royce, Councilman Wacaser, Councilman Sells, and Councilwoman Evans all stressed that they were seeking the criminal indictment of Mr. Royce due to his criticism— his so-called "attacks"—on Chief Whitlock.

40.

Discussion also revealed that the so-called "attacks" for which Mr. Royce was being targeted consisted of his criticisms concerning the volunteer police chaplain's impersonation of a police officer. The discussion referred to the purported "chaplain" by name.

41.

In addition to retaliating against Mr. Royce for his peaceful and accurate criticisms of Chief Whitlock and other city officials, the motion to deploy criminal charges against Mr. Royce was also expressly intended as retaliation for Mr. Royce's submission of Open Records Act requests. City Manager Grieshaber specifically referenced Mr. Royce's use of the Open Records Act as a basis for seeking the criminal indictment against Mr. Royce.

42.

Upon information and belief, City Manager Grieshaber conspired with Councilman Sells, Councilman Wacaser, and Councilwoman Evans on the plan to seek criminal charges against Mr. Royce.

43.

Upon information and belief, Chief Whitlock and Chief Schriefer also conspired with Councilman Sells, Councilman Wacaser and Councilwoman Evans on the plan to seek criminal charges against Mr. Royce.

44.

Councilman Wacaser, Councilman Sells, and Councilwoman Evans all voted for the motion to pursue criminal charges against Mr. Royce, and the motion passed.

45.

The Grantville police department—particularly Chief Whitlock and Chief Schriefer have also retaliated against Mr. Royce for his exercise of his First Amendment rights by a campaign of frequent, slow, intimidating "drive-by" maneuvers around his home.

46.

Chief Whitlock and Chief Schriefer have also taken to waiting outside the Royce home until someone leaves in a vehicle and then following that vehicle in an intimidating and harassing manner.

47.

Grantville police cars have also "tailed" Mr. Royce, following behind him for long stretches, sometimes all the way to his home.

48.

On one occasion, Chief Whitlock began pursuing a Royce family friend as she drove away from the Royce home. Chief Whitlock followed the Royce friend onto the interstate highway, frightening her into pulling over to the side of the road, at which point Chief Whitlock drove by. After this incident, Mr. Royce's wife, who witnessed it, was so frightened she decided to leave town and stay with a relative elsewhere.

49.

The retaliation against Mr. Royce is not just random, isolated, or coincidental events; it is a concerted, systematic scheme—a pattern and practice— in which all the Defendants are conspiring. There is a playbook, and it is being deployed against Mr. Royce and others with malice aforethought. Plaintiffs are aware of other citizens who have been threatened—at least one was even fired from a job—after speaking out on City issues. And more such victims will undoubtedly appear in discovery.

50.

Indeed, Mr. Royce has repeatedly appealed to the City Manager Grieshaber and the city council for their assistance in stopping the harassment by Chief Whitlock and Chief Schriefer, but they have refused to take any action.

51.

The months-long campaign of stalking and tailing of Mr. Royce and his family continues to this day and is getting worse.

## DEFENDANTS' RETALIATION AGAINST MR. McINTYRE

52.

After Mr. McIntyre raised his concerns about goings on in the police department, Chief Whitlock began another prolonged and willful campaign of retaliation.

53.

In November 2021, Chief Whitlock contacted the Coweta County Sheriff's Office, where Mr. McIntyre was working part time, and incited an internal investigation against Mr. McIntyre for so-called "civil slander."

54.

Chief Whitlock and others working in concert with him then persisted in calling the Sheriff's Office with false accusations against Mr. McIntyre and inciting others to make such calls. Eventually, unable to defend himself against the onslaught of calls, Mr. McIntyre resigned his employment at the Sheriff's Office.

55.

Chief Whitlock's campaign of retaliation against Mr. McIntyre did not stop there. In January 2022, Mr. McIntyre took a new, full-time job at the Newnan Public Defender's office. On the very first day he was called into his supervisor's office to address an inquiry about his time in Grantville.

56.

Mr. McIntyre has subsequently learned the reason his supervisor pursued that inquiry; it was Chief Whitlock's doing. Upon learning of Mr. McIntyre's new employment, Chief Whitlock boasted that he would get the "last [expletive] laugh" and called Mr. McIntyre's new employer to make problems for Mr. McIntyre.

57.

In addition to Chief Whitlock's efforts to undermine Mr. McIntyre's career, the retaliation against Mr. McIntyre also includes a discriminatory decision to deny him "premium pay" for service during the pandemic.

58.

Under the federal American Rescue Plan Act (**"ARPA"**) the City was allowed to allocate funds as "premium pay" for essential workers for their service during the COVID-19 pandemic (**"Premium Pay"**). Accordingly, the Grantville

City Council adopted a resolution authorizing premium pay "for their selfless sacrifices to the citizens and residents of Grantville." (the **"Resolution"**). The Resolution approved "retroactive premium pay for all full-time and party employees at a rate of $2.00 per hour for every regular hour worked from July 1, 2020, through May 31, 2021."

59.

As originally drafted, the Resolution provided Premium Pay to all employees who worked from July 1, 2020, through May 31, 2021, regardless of whether they were still employed at the time of the Original Resolution.

60.

But Councilman Sells, Councilwoman Evans, Councilman Wacaser, and City Manager Grieshaber—presumably at the instigation of Chief Whitlock and Chief Schriefer—conspired to revise the Resolution. They added an arbitrary requirement that employees could only receive Premium Pay if they had remained employed through December 13, 2021 (the **"Arbitrary Cutoff"**).

61.

This Arbitrary Cutoff was targeted at Mr. McIntyre. Its purpose was to deny payments to Mr. McIntyre in order to retaliate against him for his criticism of missteps and wrongful practices in the police department.

62.

The Resolution as adopted was the revised version that included the Arbitrary Cutoff.

63.

The Defendants' purported, *post hoc* excuse for the Arbitrary Cutoff is false and pretextual. They have contended that the Arbitrary Cutoff was imposed as a means of punishing employees who resigned without giving two weeks' notice, but the Resolution as adopted says nothing about any notice issue, and no such issue was mentioned to Mr. McIntyre when he asked why he was being denied any Premium Pay. Furthermore, upon information and belief, the Defendants have authorized Premium Pay to one employee who resigned his City employment without giving two weeks' notice.

## DEFENDANTS' DISCRIMINATION AND RETALIATION AGAINST MR. ETHRIDGE

64.

Mr. Ethridge was employed as a member of the Grantville police department from 2015 to 2021.

65.

Mr. Ethridge came to the Grantville police department after decades of successful achievement in the criminal justice field, including rising to the rank Major in the Clayton County Sheriff's Office (where he was the third highest ranking person in what was then the fifth largest sheriff's office in Georgia) and serving as a Master Patrolman and Detective in the DeKalb County Police Department.

66.

Throughout Mr. Ethridge's time at the Grantville police department Mr. Ethridge encountered systematic, pervasive, and severe racial discrimination, incited, fostered, and encouraged by Chief Whitlock.

67.

Chief Whitlock once told Mr. Ethridge that it is okay to call someone a [N-word] if they are acting like a [N-word]. In addition to being outrageous and

inexcusable, Chief Whitlock's statement came out of nowhere. It was a calculated move to offend and intimidate Mr. Ethridge and to ascertain how willing Mr. Ethridge would be to "go along" with a racist culture.

68.

Mr. Ethridge heard the N-word used by white Grantville police officers on other occasions, including one instance that is recorded on video. But, more sinister and nefarious, because Mr. Ethridge made clear that he would not approve such behavior, he was shunned. When other members of the police department saw Mr. Ethridge approaching, they would simply cease their conversations and walk away, rather than accept him as an equal.

69.

During Mr. Ethridge's tenure, Grantville Police Department employed one other black police officer who tacitly permitted the use of slurs in the workplace with little protest. This officer did not face the same harshness or unequal treatment as Mr. Ethridge.

70.

Chief Whitlock routinely mocked and belittled Mr. Ethridge and expressed outrage towards Mr. Ethridge for minor errors. On one occasion, Chief Whitlock

had Mr. Ethridge summoned to a meeting with City Manager Grieshaber. The

meeting was at first ostensibly over performance issues, but Chief Whitlock and

Chief Schriefer (who also attended) acknowledged that there were no problems

with Mr. Ethridge's performance or work ethic. Instead, Chief Whitlock—whose

main contribution to race discussions with Mr. Ethridge was his observation that

"it's okay to call someone a [N-word]"—complained that Mr. Ethridge was

supposedly too concerned about race-related matters.

71.

Members of the police department also circulated a vicious rumor that Mr.

Ethridge, himself, was supposedly racist (notwithstanding that Mr. Ethridge's

grandfather is biracial).

72.

Mr. Ethridge experienced concrete instances of disparate treatment that have

no explanation other than his race.

73.

Whereas a young, relatively inexperienced white police officer was

promoted to the rank of sergeant without having to pass a test, Mr. Ethridge was

21

required to take a test, despite his decades of experience and having previously

held that rank (and much higher) in other, larger departments.

74.

Throughout his time at the police department, Mr. Ethridge was never issued

a ballistic vest tailored to his measurements. Other members of the department

were measured and issued properly fitting vests, but not Mr. Ethridge. Throughout

his years on the department, Mr. Ethridge wore "hand-me-down" vests.

75.

Chief Whitlock demeaning attacks and bullying intensified during 2021,

ultimately causing Mr. Ethridge to resign from the department. Mr. Ethridge

decided to leave, and thus put an end to the mistreatment, despite being just a few

weeks away from the vesting of his pension.

76.

As he resigned, Mr. Ethridge expressed his concerns about racial

discrimination in writing to City Manager Grieshaber.

77.

Rather than investigate and address Mr. Ethridge's concerns about racism in

the police department, Mr. Grieshaber summarily and wrongly rejected them.

78.

Rather than investigate and address Mr. Ethridge's concerns about racism in the police department, the City, City Manager Grieshaber, Councilman Sells, Councilwoman Evans, and Councilman Wacaser—presumably at the urging of Chief Whitlock—revised the Resolution concerning premium pay to include the Arbitrary Cutoff.

79.

The inclusion of the Arbitrary Cutoff in the Resolution concerning Premium Pay was targeted at Mr. Ethridge (as well as Mr. McIntyre) because of his race and as retaliation for Mr. Ethridge's exercise of his First Amendment right to shed light on the racist culture and practices in the police department.

## COUNT ONE
## 42 U.S.C. § 1983
## ROBERT ROYCE

80.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

81.

By pursuing criminal charges against Mr. Royce and authorizing and conducting a pattern of police harassment and intimidation, the City and the individual Defendants—Councilman Wacaser, Councilman Sells, Councilwoman Evans, City Manager Grieshaber, Chief Whitlock, and Chief Schriefer (the **"Individual Defendants"**)—have unlawfully retaliated against Mr. Royce for his exercise of his First Amendment rights.

82.

The retaliation against Mr. Royce is such as would chill a person of ordinary firmness from exercising his or her rights.

83.

It is settled law that the government may not retaliate against citizens for their exercise of the right to free speech; thus, the Defendants were all on notice and had fair warning that they were violating a clearly established right.

84.

In retaliating against Mr. Royce, the Defendants have been acting in accordance with City custom and policy.

85.

In retaliating against Mr. Royce, the Defendants have  been acting under color of law.

86.

In retaliating against Mr. Royce, the Individual Defendants have been acting as the final, policy-making authorities for the City.

87.

Councilman Wacaser, Councilman Sells, and Councilwoman Evans are not entitled to legislative immunity for their pursuit of criminal charges against Mr. Royce, because the act was not legislative in nature but a targeted act against a single individual.

88.

Mr. Royce has suffered injury as the direct and proximate result of the City's and the Individual Defendants' retaliation against him for his exercise of his First Amendment rights, including, for example, severe emotional distress from the threat of a criminal prosecution and from being menacingly stalked and tailed by Chief Whitlock and Chief Schriefer.

89.

Mr. Royce is entitled to and demands judgment in his favor on this Count against all of the Defendants—including the City as well as the Individual Defendants in both their official and personal capacities—awarding Mr. Royce compensatory damages; punitive damages; injunctive relief ordering the Defendants to cease their retaliation; attorneys' fees; expert fees; costs; and all other relief available under the law.

**COUNT TWO**
**42 U.S.C. § 1985**
**ROBERT ROYCE**

90.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

91.

Councilman Wacaser, Councilman Sells, and Councilwoman Evans, City Manager Grieshaber, Chief Whitlock, and Chief Schriefer all conspired to pursue unjustified criminal charges against Mr. Royce as retaliation for his exercise of his First Amendment rights.

92.

All of the Individual Defendants also conspired in the harassment of Mr. Royce by menacing stalking and tailing as retaliation against him for his exercise of his First Amendment rights.

93.

The Individual Defendants have thus conspired to deprive Mr. Royce of equal protection of the laws and of equal privileges and immunities under the laws.

94.

The retaliation against Mr. Royce is such as would chill a person of ordinary firmness from exercising his or her rights.

95.

The Individual Defendants were all on notice and had fair warning that the retaliation against Mr. Royce for exercising his First Amendment rights was in violation of a clearly established right.

96.

The act of passing a motion against Mr. Royce was conducted in accordance with City custom and policy.

97.

In conspiring to retaliate against Mr. Royce, the Individual Defendants have been acting under color of law.

98.

In conspiring to retaliate against Mr. Royce, the Individual Defendants have been acting as the final, policy-making authorities for the City.

99.

Councilman Wacaser, Councilman Sells, and Councilwoman Evans are not entitled to legislative immunity for their conspiracy to pursue bogus criminal charges against Mr. Royce, because the act was not legislative in nature but a targeted act against a single individual.

100.

One or more of the persons engaged in the conspiracy to retaliate against Mr. Royce for his exercise of his First Amendment rights have taken, and caused to be taken, acts in furtherance of the object of the conspiracy, including, for example, the City Council vote targeting Mr. Royce, as well as the harassing actions by the police harassment.

101.

Mr. Royce has been injured in his person and/or property as the direct and proximate result of the individual Defendants' illegal conspiracy.

102.

Mr. Royce is entitled to and demands judgment in his favor on this Count against the Individual Defendants—in both their official and personal capacities—awarding Mr. Royce compensatory damages; punitive damages; injunctive relief ordering the Defendants to cease their retaliation; attorneys' fees; expert fees; costs; and all other relief available under the law.

**COUNT THREE**
**42 U.S.C. § 1983**
**JON McINTYRE**

103.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

104.

By passing a resolution that specifically targeted Mr. McIntyre by denying him Premium Pay, the City and Individual Defendants unlawfully retaliated against Mr. McIntyre for the exercise of his First Amendment Rights.

105.

Chief Whitlock has unlawfully retaliated against Mr. McIntyre for exercising his First Amendment rights by calling Mr. McIntyre's employers, making defamatory statements about Mr. McIntyre, and stirring up internal investigations against Mr. McIntyre.

106.

In addition, Chief Whitlock has unlawfully retaliated against Mr. McIntyre for exercising his First Amendment rights by having the police department stop and harass Mr. McIntyre.

107.

These acts of retaliation against Mr. McIntyre are such as would chill a person of ordinary firmness from exercising his or her rights.

108.

In retaliating against Mr. McIntyre, the Defendants have been acting under color of law.

109.

The Defendants were all on notice and had fair warning that, in retaliating against Mr. McIntyre for his exercise of his First Amendment rights, they were violating a clearly established right.

110.

In retaliating against Mr. McIntyre, the Individual Defendants have been acting in accordance with City custom and policy.

111.

In retaliating against Mr. McIntyre, the Individual Defendants have been acting as final, policy-making authorities for the City.

112.

Councilman Sells, Councilwoman Evans, and Councilman Wacaser are not entitled to legislative immunity, because the incorporation of the Arbitrary Cutoff into the Resolution was specifically targeted against Mr. McIntyre (and Mr. Ethridge).

113.

Mr. McIntyre has suffered injury as the direct and proximate result of the City's and the Defendants' retaliation against him for his exercise of his First

Amendment rights, including, for example loss of the premium pay, and interference with his employment relationships.

### 114.

Mr. McIntyre is entitled to and demands judgment in his favor on this Count against all of the Defendants—including the City as well as the individual Defendants in both their official and personal capacities—awarding him compensatory damages; punitive damages; injunctive relief ordering the Defendants to cease their retaliation; attorneys' fees; expert fees; costs; and all other relief available under the law.

**COUNT FOUR**
**42 U.S.C. § 1985**
**JON McINTYRE**

### 115.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

### 116.

The Individual Defendants have conspired to retaliate against Mr. McIntyre for his exercise of his First Amendment rights, including conspiring to alter and

tailor the Resolution to selectively deprive Mr. McIntyre (and Mr. Ethridge) of Premium Pay.

117.

Altering the Resolution for the purpose of targeting Mr. McIntyre, intentionally and to his detriment, constitutes a retaliation and thus a deprivation of his right to equal protection under the laws.

118.

The retaliation against Mr. Ethridge is such as would chill a person of ordinary firmness from exercising his or her rights.

119.

The Individual Defendants were all on notice and had fair warning that their conspiracy to retaliate against Mr. McIntyre for exercising his First Amendment rights violated a clearly established right.

120.

In conspiring to alter and tailor the Resolution to selectively deprive Mr. McIntyre of Premium Pay, the Individual Defendants were acting under color of law.

121.

In conspiring to alter and tailor the Resolution to selectively deprive Mr. McIntyre of Premium Pay, the Individual Defendants were acting in accordance with and/or establishing City custom and policy.

122.

In conspiring to alter and tailor the Resolution to selectively deprive Mr. McIntyre of Premium Pay, the Individual Defendants—or at least Councilman Wacaser, Councilman Sells, and Councilwoman Evans—were acting as the final, policy-making authorities for the City.

123.

Councilman Wacaser, Councilman Sells, and Councilwoman Evans are not entitled to legislative immunity for their conspiracy to alter and tailor the Resolution as retaliation against Mr. McIntyre, because the act was not legislative in nature but a targeted act of retaliation against two, specific individuals.

124.

One or more of the persons engaged in the conspiracy to retaliate against Mr. McIntyre for his exercise of his First Amendment rights have taken, and

caused to be taken, acts in furtherance of the object of the conspiracy, including, for example, altering and approving the Resolution.

### 125.

Mr. McIntyre has been injured in his person and/or property as the direct and proximate result of the individual Defendants' illegal conspiracy alleged in this Count, including, for example, by the loss of Premium Pay.

### 126.

Mr. McIntyre is entitled to and demands judgment in his favor on this Count against the Individual Defendants—in both their official and personal capacities—awarding Mr. McIntyre compensatory damages; punitive damages; injunctive relief ordering the Defendants to cease their retaliation; attorneys' fees; expert fees; costs; and all other relief available under the law.

**COUNT FIVE**
**42 U.S.C. § 1981**
**LAWRENCE ETHRIDGE**

### 127.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

128.

Mr. Ethridge had an employment relationship with the Grantville Police Department.

129.

When compared to those enjoyed by white officers in similar employment relationships with the Grantville Police Department, Mr. Ethridge received inferior benefits, terms, privileges, and conditions as a result of his race.

130.

The race-motivated mistreatment of Mr. Ethridge includes, for example, the racial slurs, the denial of a fitted ballistic vest, the requirement that he test into a promotion that a less experienced white police officer received without testing, and the denial of Premium Pay. The mistreatment created a hostile work environment by its severe and pervasive nature and, also, constitutes disparate treatment on the basis of race.

131.

Mr. Etheridge was subjected to a hostile work environment on the basis of his race during the time he was employed by the Grantville Police Department.

132.

It is settled law that government employers may not engage in disparate treatment of employees on the basis of their race, or otherwise deny individuals equal protection under the law; thus, the Defendants were all on notice and had fair warning that they were violating a clearly established right.

133.

Mr. Ethridge has been injured in his person and/or property as the direct and proximate result of his disparate treatment.

134.

Mr. Ethridge is entitled to and demands judgment in his favor on this Count against all the Defendants—including the Individual Defendants in both their official and personal capacities—awarding Mr. Ethridge compensatory damages; punitive damages; expert fees; costs; and all other relief available under the law.

**COUNT SIX**
**42 U.S.C. § 1983**
**LAWRENCE ETHRIDGE**

135.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

136.

By passing a resolution that specifically targeted Mr. Ethridge by denying him Premium Pay, the City and Individual Defendants unlawfully retaliated against Mr. Ethridge for the assertion and exercise of his constitutional rights to free speech, due process, and equal protection under the law.

137.

The retaliation against Mr. Ethridge by denying him Premium Pay is such as would chill a person of ordinary firmness from exercising his or her rights.

138.

In retaliating against Mr. Ethridge, the Defendants have been acting under color of law.

139.

The Defendants were all on notice and had fair warning that, in violating Mr. Ethridge's constitutional rights, and in retaliating against him for asserting and exercising those rights, they were violating clearly established rights.

140.

In retaliating against Mr. Ethridge, the Defendants have been acting in accordance with City custom and policy.

141.

In retaliating against Mr. Ethridge, the Individual Defendants have been acting as final, policy-making authorities for the City.

142.

Councilman Sells, Councilwoman Evans, and Councilman Wacaser are not entitled to legislative immunity, because the incorporation of the Arbitrary Cutoff into the Resolution was specifically targeted against Mr. Ethridge (and Mr. McIntyre).

143.

Mr. Ethridge has suffered injury as the direct and proximate result of the City's and the Individual Defendants' violation of his constitutional rights and their retaliation against him for his assertion and exercise of his constitutional rights, including, for example, the loss of the premium pay.

144.

Mr. Ethridge is entitled to and demands judgment in his favor on this Count against all of the Defendants—including the City as well as the Individual Defendants in both their official and personal capacities—awarding him compensatory damages; punitive damages; injunctive relief ordering the

Defendants to cease their retaliation; attorneys' fees; expert fees; costs; and all other relief available under the law.

## COUNT SEVEN
## 42 U.S.C. § 1985
## LAWRENCE ETHRIDGE

145.

Plaintiffs incorporate by reference and re-allege as if completely set forth herein all the allegations in paragraphs 1 through 79 above.

146.

The Individual Defendants have conspired to retaliate against Mr. Ethridge for his exercise of his constitutional rights to free speech, due process, and equal protection by conspiring to alter and tailor the Resolution in such a fashion as to selectively deprive Mr. Ethridge (along with Mr. McIntyre) of Premium Pay because he spoke out against racial disparities in his employment.

147.

The retaliation against Mr. Ethridge is such as would chill a person of ordinary firmness from exercising his or her rights.

148.

In conspiring to alter and tailor the Resolution to selectively deprive Mr.
Ethridge of Premium Pay, the Individual Defendants were acting under color of
law.

149.

The Individual Defendants were all on notice and had fair warning that their
conspiracy to retaliate against Mr. Ethridge for exercising his First Amendment
rights violated a clearly established right.

150.

In conspiring to alter and tailor the Resolution to selectively deprive Mr.
Ethridge of Premium Pay, the Individual Defendants were acting in accordance
with and/or establishing City custom and policy.

151.

In conspiring to alter and tailor the Resolution to selectively deprive Mr.
Ethridge of Premium Pay, the Individual Defendants—or at least Councilman
Wacaser, Councilman Sells, and Councilwoman Evans—were acting as the final,
policy-making authorities for the City.

152.

Councilman Wacaser, Councilman Sells, and Councilwoman Evans are not entitled to legislative immunity for their conspiracy to alter and tailor the Resolution as retaliation against Mr. Ethridge, because the act was not legislative in nature but targeted retaliation against two, specific individuals.

153.

One or more of the persons engaged in the conspiracy to retaliate against Mr. Ethridge have taken, and caused to be taken, acts in furtherance of the object of the conspiracy, including, for example, altering, approving and implementing the Resolution.

154.

Mr. Ethridge has been injured in his person and/or property as the direct and proximate result of the individual Defendants' illegal conspiracy alleged in this Count.

155.

Mr. Ethridge is entitled to and demands judgment in his favor on this Count against the Individual Defendants—in both their official and personal capacities— awarding Mr. McIntyre compensatory damages; punitive damages; injunctive

relief; attorneys' fees; expert fees; costs; and all other relief available under the law.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for  (a) issuance of process; (b) a pretrial conference; (c) a trial by jury; (d) judgment in their favor awarding them compensatory damages, punitive damages, injunctive relief prohibiting future retaliation against them, attorneys' fees (pursuant to 42 U.S.C. § 1988 and all other applicable law), expert fees, costs, and all other remedies and relief available under the law.

Respectfully submitted, this 23d day of June 2022.

**POOLE HUFFMAN LLC**

***/s/ Lucas W. Andrews***
Lucas W. Andrews
luke@poolehuffman.com
Georgia Bar No. 019533

3562 Habersham at Northlake
Building J, Suite 200
Tucker, Georgia 30084
Telephone: (770) 988-6574
Facsimile:  (888) 709-5723

*Attorney for Plaintiffs*